UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STARR INDEMNITY & LIABILITY COMPANY, AS SUBROGATED INSURER OF ACBL RIVER OPERATIONS LLC<br><br>v.<br><br>AMERICAN RIVER TRANSPORTATION COMPANY, LLC, *in personam*, and M/V DAN MACMILLAN, *in rem* | CIVIL ACTION<br><br>NO: 21-394<br><br>SECTION: T (2) |

# FINDINGS OF FACT & CONCLUSIONS OF LAW

This maritime case arises out of two separate vessel allisions with the Helena Bridge (sometimes, the "Bridge") on February 24, 2020. The first allision occurred when the M/V DAN MACMILLAN's tow glanced off of one of the Bridge's piers as it traversed the River downbound. Some of the barges in the MACMILLAN's tow broke free and impeded vessel traffic below the Bridge. The second allision occurred thereafter when another downbound vessel, the M/V HAROLD B. DODD, along with its tow of barges, also struck the Helena Bridge. As a result of the second allision, the DODD and its owner, ACBL River Operations LLC ("ACBL"), allegedly incurred property damages, salvage costs, cargo losses, and associated expenses. Plaintiff in this action is Starr Indemnity & Liability Company ("Starr"), ACBL's insurer, who brought this suit as the subrogee of ACBL against the MACMILLAN, *in rem*, and its owner, American River Transportation Company, LLC ("ARTCO"), *in personam*. Starr alleges that its damages were solely caused as a result of ARTCO and the MACMILLAN's negligent actions following the Bridge allision. Starr seeks to recover the losses and damages paid to ACBL and the deductibles paid by ACBL. ARTCO denies any liability.

This case was tried to the Court without a jury beginning on August 3, 2022, and concluding on August 4, 2022. After carefully considering all the evidence, and pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of fact and conclusions of law. To the extent that any finding of fact may be construed as a conclusion of law, the Court adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## FINDINGS OF FACT

1. The MACMILLAN is a 190-foot, 10,500 horsepower towing vessel owned by ARTCO. The MACMILLAN pushed 30 loaded barges in its tow on the day of the allisions.

2. The DODD is a 170-foot, 9,000 horsepower towing vessel owned by ACBL. The DODD also had 30 loaded barges in its tow on the day of the allisions.

3. Starr is a foreign insurance company authorized to conduct and conducting business within the State of Louisiana.

4. At all times pertinent, Starr provided a policy of insurance to ACBL.

5. The Helena Bridge spans the Lower Mississippi River near mile marker 661.8, connecting the states of Arkansas and Mississippi.

6. The Helena Bridge has three "spans" separated by vertical support piers: (1) the "Arkansas span" closest to the west bank of the River; (2) the "Center span" in the middle of the River; and (3) the "Mississippi span" nearest the east bank of the River.

7. The Mississippi River was near flood stage, at roughly 43.5 feet, on February 24, 2022.

8. At approximately 4:57 p.m. on February 24, 2022, the MACMILLAN, piloted by Captain Marcus Matheny, was navigating southbound on the Mississippi River when one of the starboard

barges in its tow allided with the starboard side pier of the "Mississippi Span" of the Helena Bridge.[1]

9.  After the MACMILLAN struck the Bridge, Captain Matheny alerted the United States Coast Guard, but no action was taken.

10. Following the allision, one of the MACMILLAN's barges started taking on water and, around 6:04 p.m., began sinking. Captain Matheny and his crew attempted to save the barge using pumps, but it was not enough. After consulting his port captain, and to try to prevent the ruptured barge from sinking in the main channel of the River, Captain Matheny performed a "top around" maneuver to swing the sinking barge closer to the left descending bank. A top around is the rotation of the vessel and its tow. As the MACMILLAN topped around the damaged barge sank, causing 19 of the barges in the MACMILLAN's tow to break away. At this point in time, the MACMILLAN was located at mile marker 659.8, just below the Helena Bridge. It was approximately 6:07 p.m.[2]

11. At about 6:14 p.m., Captain Matheny alerted the Coast Guard about the loose barges. In response, the Coast Guard closed the section of the River below the Helena Bridge.[3]

12. Captain Matheny contacted all surrounding vessels on the main radio frequency, Channel 13, and announced the details of the casualty. Additionally, around 6:15 p.m., Captain Matheny contacted the DODD, which was piloted by Captain Brian Hamilton, and heading downbound towards the Helena Bridge.[4]

13. Captain Matheny told Captain Hamilton via radio there were "19 barges floating free down here below the bridge and there's a sunk one" with "a light on it." Captain Matheny also told

---

[1] R. Doc. 33, p. 9, ¶ 1.
[2] R. Doc. 33, pp. 9-10, ¶¶ 3-6.
[3] R. Doc. 33, p. 10, ¶ 8.
[4] R. Doc. 33, p. 10, ¶ 9.

Captain Hamilton "for what it's worth, I would stop at Jimmy Hawkens," a fixed landmark light on the right-descending bank above the Helena Bridge at mile marker 664.3.[5] At that time, the DODD was just north of mile marker 665, about 3.3 miles upriver from the Bridge, and 5.7 miles from the location of the MACMILLAN. The DODD was travelling 10.1 miles per hour.[6]

14. Captain Hamilton took two actions after receiving the call from the MACMILLAN. First, he radioed another nearby vessel owned by ACBL, the M/V CHRIS PARSONAGE, to ask if it was feasible to stop at the Jimmy Hawkens Light.[7] The PARSONAGE advised that due to the high river conditions, the DODD could not hold up around the Jimmy Hawkens Light, and doing so would risk damage to the DODD and her tow, both from partially or fully submerged trees in the area and from an observation platform that the DODD could allide with given the lack of land against which to hold.[8] The PARSONAGE, however, advised Captain Hamilton that the DODD could hold up on the left descending bank across from the Jimmy Hawkens Light.[9]

15. Captain Hamilton also spoke to his port captain. Following both conversations, Captain Hamilton decided to "hold up" on the left descending bank across from the Jimmy Hawkens Light. In doing so, Captain Hamilton considered the radio communication with Captain Matheny.[10]

---

[5] R. Doc. 33, p. 10, ¶¶ 10-11.
The following conversation occurred:
DAN MACMILLAN: Dan Macmillan to Harold Dodd.
HAROLD DODD: . . .
DAN MACMILLAN: You catch that Skipper, I got 19 barges floating free down here below the bridge and there's a sunk one uh it's right on the edge of the bar or over the bar just a little bit on this Mississippi side . . . I've got a light on it but it's pointing downstream.
HAROLD DODD: Okay, alright, yeah I'm gonna make the bridge and I'll see what it looks like . . .
DAN MACMILLAN: For what it's worth I would stop at Jimmy Hawkens. . .
HAROLD DODD: All right.
[6] R. Doc. 33, p. 10, ¶¶ 12-13.
[7] R. Doc. 33, p. 12, ¶ 25.
[8] R. Doc. 33, p. 12, ¶ 26.
[9] R. Doc. 33, p. 12, ¶ 27.
[10] R. Doc. 33, p. 12, ¶ 28.

16. In the meantime, Captain Matheny radioed another ARTCO pilot, Captain William "Tiger" Cancienne of the M/V CRIMSON GEM. The CRIMSON GEM was heading downbound but was about twenty miles upriver from the Helena Bridge at the time, or roughly two hours away. After instructing Captain Cancienne to "drop down" the radio frequency from the main channel, Captain Matheny asked Captain Cancienne to assist with the recovery of the barges. Captain Matheny advised Captain Cancienne that there was sufficient room to hold up on the left descending bank below the Bridge if necessary.[11]

17. At around 6:40 p.m., Captain Hamilton successfully backed the DODD onto the left descending bank near mile marker 663.5.[12]

18. The MACMILLAN finished gathering its scattered barges by 6:58 p.m. and the Coast Guard reopened the River below the Helena Bridge shortly thereafter.[13]

19. At approximately 7:45 p.m., the CRIMSON GEM passed the DODD where it was held up on the left descending bank and then passed underneath the Helena Bridge through the "Arkansas span" at about 7:52 p.m.[14]

20. Captain Hamilton, with some difficulty due to the current and placement of the DODD, maintained his position on the riverbank at mile marker 663.5 until 7:50 p.m.[15]

---

[11] R. Doc. 33, P. 11, ¶ 16-24.
The following conversation occurred:
DAN MACMILLAN: "Tiger, if you think you can make your way down here, I could use your help. I ain't got a pump on this boat. Every one of them's on that barge that sunk, and I just got off the phone with Bernie. . . I only got 11 barges left in tow, and I ain't got no pump, and I got another one that's two, two barge, two tanks taking on water now. That barge sunk -- I was trying to top around and get it next to the bank and that barge sunk and got underneath my tow and I guess tore the other barges up."
CRIMSON GEM: "if I keep comin', do I have some place I can stop without gettin' on top of anything down there? ... a place I can back in on that left descending bank?"
DAN MACMILLAN: "yeah, yeah, yeah. You can get up here high, Tiger. That barge is right in the middle, it's still up. It's not in the middle of the River, it's in the middle of the bar . . . ."
[12] R. Doc. 33, p. 12, ¶ 30.
[13] R. Doc. 33, p. 12, ¶¶ 32, 34.
[14] R. Doc. 33, p. 13, ¶ 33.
[15] R. Doc. 33, p. 12, ¶ 31.

21. The DODD then departed the riverbank and, for about thirty minutes, travelled downriver. At about 8:22 p.m., while attempting to traverse the "center span" of the Helena Bridge, the DODD allided with the left descending pier of the Bridge's center span, suffering significant damage and scattering its barges.[16]

22. Captain Hamilton did not know he would hit the Bridge until the DODD was approximately three-fourths to one-half of a mile (0.75 – 0.5 miles) upriver from the Helena Bridge.[17]

23. When the DODD was located between three-fourths and one-half of a mile (0.75 – 0.5 miles) upriver from the Helena Bridge, it was approximately two minutes away from the Bridge.[18]

24. Captain Hamilton did not appreciate the risk of allision until about two minutes before the DODD struck the Helena Bridge.[19]

25. Starr and ACBL executed an Assignment and Subrogation Agreement, pursuant to which Starr was assigned and subrogated to the rights of ACBL to pursue both its payments made to ACBL as a result of this incident, as well as ACBL's claims including its deductibles. The parties have stipulated that the damages recoverable by Starr total $2,128,255.30.[20]

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this admiralty and maritime case pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper in this Eastern District of Louisiana. Jurisdiction and venue are not contested by the parties. The substantive law governing this case is the general maritime law.

---

[16] R. Doc. 33, p. 13, ¶¶ 35-37.
[17] R. Doc. 33, p. 13, ¶ 38.
[18] R. Doc. 33, p. 13, ¶ 39.
[19] R. Doc. 33, p. 13, ¶ 40.
[20] R. Doc. 33, p. 13, ¶ 41.

6

2. "'Negligence is an actionable wrong under general maritime law,' and the elements of that tort are 'essentially the same as land-based negligence under the common law.'"[21]

3. A general maritime law negligence claim "requires that the 'plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury.'"[22] The harm caused must also be reasonably foreseeable.[23]

4. The captain of a vessel has "a special duty to take all reasonable steps consistent with safety to [his] ship and her crew, to avoid or minimize the chance of harm to others."[24]

5. Causation "is something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."[25] Additionally, when there are "concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident."[26] Here, Starr has the burden of proving negligence by a preponderance of the evidence.

6. Under the superseding cause doctrine, a party may not be liable for "admittedly negligent" conduct.[27] The "superseding cause doctrine applies where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."[28] However, an "intervening act" is not a "superseding cause of harm to another" if "the actor at the time of his negligent conduct

---

[21] *ADM International SARL v. River Ventures, LLC*, 441 F.Supp. 3d 364, 375 (E.D. La. Feb. 28, 2020) (quoting *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010)).
[22] *ADM International SARL v. River Ventures, LLC*, 441 F.Supp. 3d 364, 375 (E.D. La. Feb. 28, 2020) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).
[23] *Id.*
[24] *Boudoin v. J. Ray McDermott & Co.*, 281 F. 2d 81, 85 (5th Cir. 1961).
[25] *Howard v. Offshore Liftboats, LLC*, 2016 WL 145257 at *2 (E.D. La. Jan. 11, 2016); *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 213-14 (5th Cir. 2010).
[26] *Id.*
[27] *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837-38 (1996) (citation omitted).
[28] *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367–68 (5th Cir. 2006).

should have realized that a third person might so act," a "reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted," or "the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."[29]

7. "'It has long been the law that errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged.... Courts are not supposed to second guess parties in peril and expect from them the most precise judgments.'"[30]

8. "[W]here, without prior negligence, a vessel is put in the very center of destructive natural forces and a hard choice between competing courses must immediately be made, the law requires that there be something more than mere mistake of judgment by the master in that decision *in extremis*."[31]

9. The "*in extremis* doctrine...requires a court to leniently judge errors in judgment committed by a vessel 'put in sudden peril through no fault of her own.'"[32] Generally, the danger must be "sudden," or near in time.[33] Additionally, the "fault" must lie beyond the actions of the pilot entirely.[34] In short, the "party relying on the doctrine must be *completely free* from fault" in the

---

[29] *Howard v. Offshore Liftboats, LLC*, 2016 WL 145257 at *4 (citing *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir. 1992)).
[30] *Crescent Towing & Salvage Co., Inc. v. CHIOS BEAUTY MV*, 610 F.3d 263, 268 (5th Cir. 2010) (quoting *Union Oil Co. of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 674 (5th Cir. 1969)).
[31] *Id.* (citations omitted).
[32] *Cornerstone Chem. Co. v. Nomadic Milde M/V*, 2022 WL 1568475, at *3 (E.D. La. May 18, 2022) (citations omitted).
[33] *See In re Complaint of Magnolia Marine Transp. Co.*, 1995 WL 413005, at *4-5 (5th Cir. 1995) (focusing on the "five minutes" a pilot had to respond to an emergency situation).
[34] *Id.* ("[A]ided by two radios, radar, and the full knowledge of the presence, location, and direction of all three vessels, two of which were in dense fog, the POINTE COUPEE had more than five minutes in which to do something to avoid these collisions, and instead chose to do nothing at all until seeing the SAM LEBLANC three hundred (300) feet away. At that point Deshotel's peril upon sighting the SAM LEBLANC emerging from the fog bank was hardly sudden nor without fault of the POINTE COUPEE"). *See also Tug Barbara E. Bouchard Corp. v. AMAZONIA MV*, 117 F. App'x 968 (5th Cir. 2004) ("Here, the district court found negligence on the part of Culpepper because he did not take proper

creation of the emergency.[35] Thus, the doctrine only forgives actions taken during the emergency, not those prior. "It does not excuse a vessel making a wrong maneuver *in extremis* where the imminence of the peril was occasioned by the fault or negligence of those in charge of the vessel, or might have been avoided by earlier precautions which it was bound to take."[36] Ultimately, the doctrine does "not prevent a finding of liability," but instead simply requires the court "judge a captain's reactions more leniently because of the crisis situation."[37] The *in extremis* standard of care, however, should not be applied to the actions of a captain who had ample time to avoid the peril.[38]

10. In this matter, Starr argues that ARTCO and the MACMILLAN acted negligently on two occasions, namely in performing the "top around" maneuver and during Captain Matheny's radio communication with Captain Hamilton. The Court addresses each in turn.

11. As an initial matter, Starr does not genuinely argue that the negligence of ARTCO or the MACMILLAN prior to or during the first allision was the proximate cause of its damages.[39] Still, the Court finds that ARTCO was not negligent with regard to Starr before or during the first allision. There is no evidence that the MACMILLAN owed a duty to the DODD at the time, and thus, that any duty was breached. Additionally, Starr cannot point to any causal connection between the two allisions, especially considering the gap in time. Finally, the superseding cause doctrine cuts any connection between the two events due to Captain Hamilton's own independent actions in electing to "hold up" the DODD on the left descending back rather than at Jimmy

---

corrective action to reposition the BOUCHARD flotilla before the squall ever started. Because the BOUCHARD flotilla was found to be negligent prior to the storm, we conclude the *in extremis* doctrine was inapplicable").
[35] *City of Chicago v. M/V Morgan*, 375 F.3d 563, 577 (7th Cir. 2004) (emphasis added).
[36] *Id.*
[37] *Grosse Ile Bridge Co. v. American Steamship Co.*, 302 F.3d 616, 625-26 (6th Cir. 2002).
[38] *Crescent Towing & Salvage Co., Inc. v. CHIOS BEAUTY MV*, 610 F.3d 263, 268 (5th Cir. 2010).
[39] "Starr does not argue that the DAN MACMILLAN's allision with the Helena Bridge was a legal cause of the HAROLD DODD also alliding with the bridge. Instead, the post-allision negligent acts of ARTCO ultimately were the legal cause of the HAROLD DODD's allision." R. Doc. 40 at 11.

Hawkens Light on the right descending bank. Consequently, this Court finds the MACMILLAN's allision with the Helena Bridge was not a "substantial factor in bringing about" the DODD's allision nearly one and one-half hours later.

12. The thrust of Starr's negligence theory is that Captain Matheny acted negligently when, after striking the Helena Bridge, he attempted to "top around" the MACMILLAN's sinking tow. Captain Matheny has piloted vessels like the DAN MACMILLAN for seven years and worked in the wheelhouse of ships for fifteen years. At trial, Captain Matheny testified that he performed the top around in order to get closer to the left descending bank and prevent the damaged barge from sinking in the main channel. Captain Matheny has performed this maneuver numerous times and did not make the decision lightly. Only after discussing it with his Port Captain, Bernie Heroff, did Captain Matheny decide it would be the best course of action to take. When the maneuver failed, Captain Matheny told his crew it was a "dumb mistake." At trial, however, Captain Matheny believed the "tow probably would have busted up anyway."

13. Captain Dewey, ARTCO's expert, has held a master mariner's license since the early 2000s and has personally navigated the Helena Bridge "many times." This Court accepted Captain Dewey as an expert in inland tow boat operations, navigation, and safety. Captain Dewey has executed top arounds on numerous occasions as they are commonly performed by vessels operating on the Mississippi River. At trial, Captain Dewey testified that Captain Matheny's maneuver was justified due to the risk of a damaged barge sinking in the main channel. Specifically, he approved of Captain Matheny's attempt to bring the barge closer to the bank, stating he has taught the importance of such conduct throughout his whole career. He also agreed with Captain Matheny that it was very likely the barges would have broken free regardless of the

top around maneuver because of the stress placed on the barge wires by the sinking barge and river current.

14. Captain Samuel Schropp, Starr's expert, echoed Captain Dewey's sentiments. Captain Schropp has navigated the Mississippi River for decades, including traversing the Helena Bridge before and after February 24, 2020. This Court accepted him as an expert in the navigation of the Lower Mississippi River. When asked whether performing the "top around" was an incorrect decision, Captain Schropp testified it was not. He stated the MACMILLAN had a sinking barge and the vessel was doing the best it could at the time in an emergency situation to mitigate potential damages.

15. Captain William "Tiger" Cancienne also agreed with the MACMILLAN's decision to top around. Captain Cancienne has piloted the CRIMSON GEM for ten years. When asked about Captain Matheny's regret regarding the top around, Cancienne confirmed that best course of action in such situations is to get the sinking vessel as close to the bank as possible and keep it from blocking the navigable channel.

16. Consequently, the Court finds Captain Matheny's decision to top around was reasonable, and the maneuver was not performed negligently. Captain Matheny, as master of the MACMILLAN, owed a duty to the DODD to "take all reasonable steps consistent with safety to [his] ship and her crew, to avoid or minimize the chance of harm to others."[40] The Court finds Captain Matheny actions complied with that duty. At trial, the Court heard from several captains that top around maneuvers are common and often necessary. Those same witnesses believed Captain Matheny's particular maneuver was justified. At the same time, as Captain Dewey testified, the alternative of allowing the barge to sink in the main channel would create a danger

---

[40] *Boudoin v. J. Ray McDermott & Co.*, 281 F. 2d 81, 85 (5th Cir. 1961).

to other mariners.[41] Additionally, the superseding cause doctrine severs any connection between the two events due to Captain Hamilton's own independent actions. Accordingly, this Court cannot say the top around was a "substantial factor in bringing about" the DODD's allision, especially considering the significant temporal gap between the two events.

17. Starr also contends that Captain Matheny's radio communications, or lack thereof, to Captain Hamilton constituted negligence. Starr maintains Captain Hamilton relied on the radio communication as an instruction to stop above the Bridge and, in doing so, was faultlessly placed in peril. The Court finds that Captain Matheny's communications with Captain Hamilton were neither negligent nor did they cause the DODD's allision with the Helena Bridge.

18. Captain Hamilton has worked in the wheelhouse of large vessels for over twenty years and piloted the DODD for the last eight years. He has traversed the Mississippi River "hundreds" of times. Captain Hamilton testified that the River was "extremely high" and risky to navigate on February 24, 2020. When he received the radio communication from Captain Matheny, he interpreted it as a warning to not come below the Bridge. Captain Hamilton, noting such communications are common, testified that, when a fellow mariner issues such a warning, it must be observed. Starr emphasizes that Captain Hamilton radioed another vessel, the PARSONAGE, for advice before making the decision to stop on the left descending bank above the Bridge. Captain Hamilton testified that he and the PARSONAGE discussed stopping at the Jimmy Hawkens Light, but concluded it was too risky considering the River conditions. Therefore, Captain Hamilton took Captain Matheny's communication into account when he decided to stop on the left descending bank of the River. Consequently, Starr contends the advice of Captain

---

[41] Furthermore, the tow likely would have broken away even without the top around, indicating the maneuver was not negligently performed so as to cause the break away.

Matheny to stop above the Bridge negligently caused the DODD to allide with the Helena Bridge because it forced Captain Matheny into a dangerous position on the River.

19. The Court notes that Captain Matheny specifically advised Captain Hamilton to stop at the Jimmy Hawkens Light. Captain Hamilton, however, never seriously considered stopping at Jimmy Hawkens. At trial, Captain Hamilton testified that, before parking on the left descending bank, he did not follow up with Captain Matheny or the Coast Guard because when he received the warning call from the MACMILLAN he had already ruled out stopping at the Jimmy Hawkens Light. When Captain Hamilton called the PARSONAGE, it was to receive assurance that stopping at Jimmy Hawkens was not a good idea. In fact, before Captain Hamilton got off the radio with the PARSONAGE, he was already steering the DODD to the left descending bank to hold up there.

20. Captain Hamilton believed that the only option available was to stop on the left descending bank across from the Jimmy Hawkens Light. Despite his confidence, four other captains testified that the Jimmy Hawkens Light was an appropriate, if not better, stopping point. Specifically, Captain Dewey testified that, through his personal knowledge of the Helena Bridge area, Captain Hamilton could have stopped at Jimmy Hawkens and rested against the trees that were submerged along the bank or easily held the DODD in position there. This is because the River is nearly slack near the right descending bank adjacent to Jimmy Hawkens compared to the left descending bank where the current was strong given the high stage of the River.

21. Captain Dewey stated such maneuvers are common and that he has backed in and laid against trees multiple times. In fact, Captain Dewey testified that, after viewing video evidence, the Jimmy Hawkens Light appeared to have trees protruding from the water on February 24, 2020, and would have allowed for such a maneuver. Captain Matheny, an experienced pilot, also thought

13

the safest thing to do was to back in at the Jimmy Hawkens Light. After all, he recommended Captain Hamilton do so. Additionally, as Captain Dewey noted, Captain Cancienne testified that he originally planned on stopping the CRIMSON GEM at the Jimmy Hawkens Light and holding up next to the DODD before the MACMILLAN called him to help wrangle barges.

22. Captain Schropp, Starr's expert, agreed Captain Hamilton could have parked on the right descending bank. Still, he thought such a maneuver would possibly cause damage to the DODD and its tow. Additionally, Captain Hamilton admitted he saw "flooded timber" at Jimmy Hawkens Light but believed it was impossible to stop there because the DODD's tow would have been like a long bulldozer through the woods. While the Court recognizes Captain Hamilton's courtroom concerns, the testimony makes clear Captain Hamilton was aware of the *possibility* of parking in or near the trees at Jimmy Hawkens. Regardless, the Court finds that Captain Hamilton did not genuinely consider such a maneuver and made the decision to park along the left descending bank.

23. Importantly, had Captain Hamilton parked at Jimmy Hawkens Light instead of the left descending bank, the DODD would have been better positioned to traverse the Helena Bridge due to the slack water on the right descending bank. Captain Hamilton testified when the River is high, as it was on February 24, 2020, he normally passes through the Arkansas span of the Bridge. By parking along the right descending bank, however, Captain Hamilton poorly staged the DODD for traversing the Bridge and, in turn, forced him to aim for the unfamiliar Center span.

24. Ultimately, as Captain Hamilton himself admitted, Captain Matheny's decision to radio ahead and warn him was the correct thing to do. In fact, not a single witness, expert or otherwise, testified that Captain Matheny acted improperly in calling the DODD. Instead, Starr contends more should have been said, which would have prevented the DODD's allision with the Bridge. Captain Schropp testified that, by not informing Captain Hamilton of the exact location of the

MACMILLAN's loose tow, Captain Matheny omitted critical information. The Court finds that opinion unpersuasive. The suggestion to stop at the Jimmy Hawkens Light was a prudent one and, in regard to Captain Matheny's duties, he relayed a satisfactory amount of information to Captain Hamilton. Captain Hamilton, however, did not heed the advice. Instead, upon his own decision, Captain Hamilton maneuvered his way into the left descending bank and, as a result, had to traverse an unusual section of the Bridge.

25. Consequently, this Court finds Captain Matheny did not breach any duty by advising Captain Hamilton to stop at the Jimmy Hawkens Light. Nor was Captain Matheny negligent in failing to disclose additional information about the precise location of the MACMILLAN's loose barges. Captain Matheny was required to "take all reasonable steps consistent with safety to [his] ship and her crew, to avoid or minimize the chance of harm to others."[42] As Captain Cancienne testified, it was not safe for Captain Hamilton to navigate past the Bridge with loose barges scattered about the River. Captain Schropp echoed this concern, testifying that drifting barges present a significant hazard to other vessels in navigation. By prudently radioing ahead and recommending a safe stopping point, Captain Methany fulfilled his duties to the DODD. It cannot be said that Captain Matheny omitted crucial information by not specifying the location of the tow because he relayed a reasonably adequate amount of information to Captain Hamilton under the circumstances.[43] Therefore, Captain Matheny did not breach any duty.

---

[42] *Boudoin v. J. Ray McDermott & Co.*, 281 F. 2d 81, 85 (5th Cir. 1961).

[43] Notably, the Court is not persuaded by Starr's argument that Captain Matheny should have given the DODD the same information he did to the CRIMSON GEM. First, the CRIMSON GEM was two hours away. Captain Matheny knew that by the time the vessel would arrive on-scene, the situation would be different. Second, Captain Matheny told the CRIMSON GEM it could come below the bridge because he was asking for assistance in recovering the tow that broke loose *below* the bridge. Finally, Captain Matheny may have told the CRIMSON GEM it could traverse the bridge because he anticipated the DODD would be moored above the bridge, meaning he did not want the CRIMSON GEM impeding the DODD's parking or departure maneuvers.

26. Furthermore, Captain Matheny's radio communication was a not a "substantial factor in bringing about" the second allision. When Captain Hamilton ignored Captain Matheny's advice and decided to stop on the left descending bank, he acted imprudently, independently, and unforeseeably. Captain Dewey testified that he has never witnessed a vessel stop where the DODD did, remarking that Jimmy Hawkens is the usual place to hold up above the Helena Bridge. The Court finds that a reasonable mariner would have considered Captain Hamilton's decision to park along the left descending bank unreasonable and highly extraordinary.[44] Consequently, Captain Hamilton's actions were a superseding cause of the DODD's allision because they placed the vessel in a section of the River that made the DODD difficult to steer through the Bridge. Captain Hamilton himself testified that each moment spent trying to straighten up the DODD as it approached the Bridge meant his margin of error was closing. When he failed to close the gap, the DODD struck the Bridge. In the end, as Captain Hamilton admitted, he bears final responsibility for the navigational and operational decisions of the DODD.

27. Starr asserts the *in extremis* doctrine applies here, resulting in the exclusive liability of ARTCO and the MACMILLAN. The Court finds the doctrine does not apply in this case because the DODD was not *in extremis* as a result of any act or omission of ARTCO, the MACMILLAN, or Captain Methany. As an initial matter, the *in extremis* doctrine cannot apply to the decisions Captain Hamilton made after he parked the DODD on the left descending bank across from Jimmy Hawkens Light at 6:41 p.m. Captain Hamilton testified that, while holding in place, he was comfortable and absolutely confident he would not hit the Bridge. Captain Schropp noted that holding the DODD in place on the bank was not an overly difficult task under the circumstances. At the same time, once he left the bank, Captain Hamilton felt he had properly positioned the

---

[44] Additionally, the Court finds the "intervening act" was not a normal consequence of the situation created by ARTCO, and the MACMILLAN could not have realized the DODD would act as it did.

16

DODD to traverse the Helena Bridge. Additionally, as discussed above, Captain Hamilton is not completely free of fault before he parked his vessel because he elected to hold up on the left descending bank instead of at Jimmy Hawkens Light. Therefore, any conduct during or after the parking of the DODD cannot form the basis of an *in* extremis defense.[45]

28. As for the time period before Captain Hamilton decided to stop on the left descending bank, the Court finds the *in extremis* doctrine does not apply for four reasons. First, the alleged danger to the DODD was not "sudden." Indeed, Captain Hamilton received notice from Captain Matheny that the MACMILLAN's barges were adrift at about 6:15 p.m. Captain Hamilton then took time to evaluate the potential stopping points between his vessel and the Bridge and called the captain of the PARSONAGE to get his opinion on the matter. Thereafter, Captain Hamilton began slowing the DODD down to maneuver into his chosen landing spot on the left descending bank across from the Jimmy Hawkens Light. The Court concludes that Captain Hamilton had sufficient time to make a prudent decision under the circumstances.[46]

29. Second, Captain Hamilton's decision to hold up on the left descending bank is what ultimately resulted in the DODD's allision with the Bridge. After all, several captains testified that the vessel could have parked at the Jimmy Hawkens Light. Instead, Captain Hamilton disregarded that advice and charted his own course to a location that proved difficult to navigate when bound for the Bridge.

---

[45] Also, it is clear that Captain Hamilton, from the moment he parked, had time to react to prevent any catastrophe. For example, he could have remained on the bank or asked for assistance from tug boats. *See Magnolia Marine Transp.*, 1995 WL 413005, at *4-5 ("[A]ided by two radios, radar, and the full knowledge of the presence, location, and direction of all three vessels, two of which were in dense fog, the POINTE COUPEE had more than five minutes in which to do something to avoid these collisions, and instead chose to do nothing at all until seeing the SAM LEBLANC three hundred (300) feet away. At that point Deshotel's peril upon sighting the SAM LEBLANC emerging from the fog bank was hardly sudden nor without fault of the POINTE COUPEE").
[46] *See id.* (Focusing on the "five minutes" a pilot had to respond to an emergency situation).

30. Third, the Court finds that the DODD was not placed in an emergency situation. As discussed above, Captain Hamilton had sufficient time to evaluate the situation and consult others before he decided that the best location to stop was the left descending bank. Although Captain Hamilton was required to act quickly, his decision making was not caused by an imminent peril that forced him to take reflexive action in avoidance of certain danger. Instead, Captain Hamilton's conduct, including the use of navigational aids, radio contact, and consideration of the advice from fellow mariners, show that he had time to weigh the pros and cons of at least two landing spots before taking action.

31. Finally, even if the *in extremis* doctrine did apply to the DODD, it would not serve to exculpate Captain Hamilton for his unfortunate decision to not stop at the Jimmy Hawkens Light. After all, the error *in extremis* doctrine does not absolve a party of its fault. Instead, it permits a district court to "leniently" judge the actions of a distressed mariner. Here, Captain Hamilton's decision to forego the advice of Captain Matheny, ignore Jimmy Hawkens light, and park on the left descending bank was an error in navigation committed by Captain Hamilton to which the Court attributes the second allision.

Based on the foregoing findings of fact and conclusions of law, this Court finds that the DAN MACMILLAN and ARTCO did not act negligently in regard to the HAROLD B. DODD on February 24, 2020. The HAROLD B. DODD's allision with the Helena Bridge was the fault of its own agents and is far too detached from any acts or omissions of the defendant here. Accordingly, all claims asserted against defendant, American River Transportation, Co., LLC, are **DISMISSED WITH PREJUDICE**. Judgment will be entered in favor of the Defendant.

New Orleans, Louisiana this 30th day of March 2023.

GREG GERARD GUIDRY
UNITED STATES DISTRICT JUDGE